

Colin Prince
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Nate Williams

# United States District Court
## Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States,<br><br>      Plaintiff,<br><br>  v.<br><br>Nathaniel Williams,<br><br>      Defendant. | No. 18-cr-39-SMJ<br><br>Sentencing Memorandum |

# TABLE OF CONTENTS

Introduction.................................................................................................1

I.  BASE OFFENSE LEVEL & ENHANCEMENTS ....................................1

II. DEPARTURES ...............................................................................2

    A.  Extraordinary family circumstances warrant a departure.................2

    B.  The case is atypical and warrants a non-heartland departure...........4

III. THE SENTENCING REFORM ACT: 18 U.S.C. § 3553......................5

    A.  Mr. Williams's history favors a sentence of probation....................5

    B.  The nature of the offense warrants probation, not prison................7

        1.  Mr. Williams was trying to start a legal marijuana operation. ...........7

        2.  Mr. Williams's firearms should not give the Court pause about probation.13

    C.  Probation constitutes a just sentence and promotes respect for the law. ...........16

    D.  Mr. Williams's extraordinary rehabilitation and pretrial compliance warrant probation.................................18

    E.  A prison sentence would serve no deterrent purpose. ...................19

    F.  A guideline sentence would create disparity. ..............................20

IV. CONCLUSION.............................................................................21

## Introduction

To paraphrase an admittedly apocryphal Abraham-Lincoln quote: do not snatch defeat from the jaws of victory. Mr. Williams has already become what the Court, the public, and his family need him to be—a hard-working, law-abiding, tax-paying father and citizen. He is a model for why this district needs (but sadly lacks) a pretrial diversion program. For three years, Mr. Williams has worked steadily in construction, cared for his children, and religiously obeyed Probation's rules. If he were on post-trial supervision, the defense would be moving to early-terminate. He is already a success for the system. To send Mr. Williams to prison now for a marijuana offense would be a sentence with far more antisocial impact than Mr. Williams's crime.

Nathaniel Williams therefore respectfully requests a sentence of probation followed by 10-years of supervised release.

## I.    Base Offense Level & Enhancements

The parties' guideline calculations as outlined in the plea agreement are slightly below Probation's calculation based on a disagreement regarding the marijuana amount.[1] The government has objected to the base offense level,[2] and Mr. Williams joins the objection. Mr. Williams otherwise agrees with the enhancements as applied in the PSR.

---

[1] *See* PSR ¶ 133.

[2] ECF No. 69 at 1.

## II.    Departures

### A.    Extraordinary family circumstances warrant a departure.

The Court should depart from the guidelines because Mr. Williams has become the sole, single caretaker to his 15-year old daughter, M.P., after her mother's death. She has no other caretaker and would likely be placed into foster care if Mr. Williams is incarcerated.

Under U.S.S.G § 5H1.6, courts may depart from the guidelines "based on loss of caretaking or financial support" where a prison sentence: (1) "will cause a substantial, direct, and specific loss of essential caretaking or essential financial support"; (2) the loss "substantially exceeds the harm ordinarily incident to incarceration"; (3) the financial support is "irreplaceable"; and (4) granting a departure "will address" (i.e., fix) the problem. All of these are true here.

This case is unusual. In March 2019, approximately two years ago, while Mr. Williams was on pretrial supervision, his then-13-year-old daughter and her mother, Michelle Porter, were driving in a Ford Expedition on a trip to Minnesota. Outside Billings, Montana, something happened to the wheel bearings and a wheel spun off the car while speeding down the highway at 75 miles per hour. The Expedition flipped multiple times and came to a rest upside down. M.P. escaped through a window and went to the front of the car to find her mother badly mangled, her face nearly torn off in

1  the accident. An ambulance quickly arrived, but M.P. watched her mother die while

2  paramedics tried to revive her on the roadside.

3      M.P. has no grandparents able to care for her, and Mr. Williams was awarded

4  full custody—he is, and has been for two years, M.W.'s sole financial support and

5  caretaker. Mr. Williams has ensured his daughter received counseling, he holds her

6  hand through panic attacks and through recurring nightmares. He makes sure she gets

7  to school (she attends Lewis and Clark High School here in Spokane), attends choir

8  practice, and does her homework.[3] M.P. even attended the PSR interview and spoke

9  with Probation.[4]

10     To provide for M.P., Mr. Williams joined a union, Local 238, where he

11  specializes in concrete work.[5] While on pretrial release, he has worked on road-crews

12  throughout Eastern Washington and local construction at the North Town Mall,

13  making around $30 an hour. He remains a dues-paying union member today, and his

14  financial support is irreplaceable.

15     These are circumstances warranting a drastic departure. As one court put it in

16  granting a 13-level downward departure to a single parent: "The rationale for a

17  downward departure here is not that [defendant's] family circumstances decrease her

18  _____

    [3] PSR ¶ 95.

19  [4] *Id.*

    [5] PSR ¶ 104.

Sᴇɴᴛᴇɴᴄɪɴɢ Mᴇᴍᴏʀᴀɴᴅᴜᴍ
– 3 –

culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *U.S. v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992). This Court should likewise avoid wreaking destruction on M.P.—there is nowhere for this child to go (other than to become a ward of the state), and that does not benefit the public, Mr. Williams, or the court system.

**B.    The case is atypical and warrants a non-heartland departure.**

The Sentencing Commission says it "intends the sentencing court to treat each guideline as carving out a 'heartland,' a set of ***typical*** cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt. A, 4(b) (emphasis added). But "when a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id.*; *see also Koon v. U.S.*, 518 U.S. 81, 95 (1996) (unaccounted for factors may justify departure for "case out of the Guideline's heartland").

This is no typical drug-trafficking case to which § 2D1.1 applies. To begin with, it is a marijuana case—a substance legal in Washington and legal or decriminalized in most of the country. That alone makes this something other than a "heartland" drug case. Moreover, as discussed at length below, Mr. Williams was attempting to start a legal marijuana grow, licensed under Washington's I-502, at the time of his arrest. That too makes this a highly unusual drug-trafficking case worthy of a departure.

### III.    The Sentencing Reform Act: 18 U.S.C. § 3553

At sentencing, courts should impose only what is necessary to achieve the Sentencing Reform Act's goals—and nothing more. *U.S. v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) ("[a] substantively reasonable sentence is one that is 'sufficient, but not greater than necessary") (quoting 18 U.S.C. § 3553(a) (emphasis added)). Although guideline ranges are relevant, courts "may ***not presume*** that the Guideline range is reasonable," *Gall v. U.S.*, 552 U.S. 38, 49–50 (2007); instead, they must focus on deterrence, retribution, incapacitation, and rehabilitation.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)–(D);[6] *see also Rita v. U.S.*, 551 U.S. 338, 366 (2007) (Stevens, J., concurring) (noting guidelines are "truly advisory"). Courts are "free to make [their] own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines"—which should not have "any thumb on the scales." *Kimbrough*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring) (emphasis added).

### A.    Mr. Williams's history favors a sentence of probation.

Mr. Williams has been, for most of his life, a hardworking person. He was born in Fort Knox, Kentucky, to two military parents, Susan and Bryant Williams, his

---

[6] "Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?" *United States v. Cole*, 2008 WL 5204441, at *4 (N. D. Ohio Dec. 11, 2008).

mother a first lieutenant Army nurse; his father an Army drill sergeant. His parents divorced not long after his birth, and Mr. Williams spent most of his childhood without a stable home, bouncing between parents and living in 34 states before he was 15-years old. (His mother would relocate as often as 3 to 6 months.)

Mr. Williams's father was mostly absent—they communicated by phone and saw each other over summer vacations when Mr. Williams would live in a poor, rural part of Florida (Bronson, outside Gainsville), where he started farm work at 12-years old picking and loading watermelons. Mr. Williams remembers people selling drugs in the front yard, some of whom were his family. His father was eventually arrested and imprisoned on drug charges.

Mr. Williams's mother is another story. He calls her a "pioneer"—a black, female military officer. She took Mr. Williams and his brother to museums, national parks, the YMCA—normal childhood experiences.

Mr. Williams was on his own at 18-years old. He moved to Post Falls, Idaho, obtained his GED at North Idaho College, and even took classes in the school's criminal justice program while working for a tow-truck company. He stayed in the area and worked over the years in flooring and construction.

In 2010, marijuana found Mr. Williams. At the time, he was working in construction and was hired to build an indoor medical marijuana grow. When the

owners found that Mr. Williams had a farming background (i.e., the years in Florida), they hired him to supervise the operation.

### B.    The nature of the offense warrants probation, not prison.

The Sentencing Reform Act directs courts to consider "the nature and circumstances of the offense," and here, the offense warrants probation, a fine, community service, or some other creative and prosocial penalty, but not prison. *See* 18 U.S.C. § 3553(a)(1).

### 1.    Mr. Williams was trying to start a legal marijuana operation.

When Mr. Williams was arrested, he was in the process of starting a legal marijuana business. The PSR begins discussing the offense conduct in 2015 and 2016, when Mr. Williams was working with Trent Snider and Jennifer Dillard and growing at a home in Spokane Valley.[7] The home had been rented with full knowledge by the owners that it was to be used as a marijuana grow.[8] The reason the owners agreed to lease their property to marijuana growers was simple: Mr. Williams, Snider, and Dillard all had valid medical marijuana licenses. Mr. Williams handled the grow for Snider and Dillard, who paid the utility bill at the home.[9]

---

[7] PSR ¶ 10.

[8] Bates 149. The lessor, Tony Weeks, "requested to grow medical marijuana" and "the owners of the property reluctantly agreed." Weeks turned the grow over to Mr. Williams, and "Trent Snider and Jennifer Denise Dillard were also present." *Id.* 149–50.

[9] Bates 153 (noting Dillard and Trent paid the $3,000 utility bill).

According to a sworn affidavit by Officer Michael Bahr, by November 2016, Mr. Williams was parting ways with Snider and Dillard and called the government's CS to discuss obtaining a Washington State 502-license: "Williams talked to the CS about purchasing a Washington State tier one marijuana growing license."[10] Mr. Williams wanted the CS to obtain the license; he would grow; and they would split the profits.[11] A week later, Mr. Williams and Ms. Dillard arranged a tour for the CS of a fully licensed and legal marijuana grow run by Dillard.

The operation closely observed Washington regulations. The CS had to "sign a visitor log."[12] The CS asked about why there were video cameras at the grow: "Dillard said that it was a requirement to have and keep 45 days of video at the marijuana grow"[13]—by Washington law. Dillard noted they paid "Washington State taxes."[14] They discussed "growth time, rent, electrical cost and reusing pots"—basic business affairs.[15] Dillard explained that she and Snider were licensed by Washington State, and had partnered with others, including Mr. Williams, who "handles the marijuana

---

[10] Bates 85.

[11] *Id.*

[12] Bates 88.

[13] Bates 88.

[14] Bates 88.

[15] Bates 87.

grows," and Snider, who "is the accountant for the group."[16] They encouraged the CS

to invest and replace a partner that was not contributing.[17] Dillard said she was "trying

to run an up and up" company.[18]

     A few months later, in February 2017, the CS against contacted Mr. Williams

about his grow at Sherman Road, outside Spokane.



---

[16] Bates 88–89.

[17] *Id.*

[18] Bates 89.

At the time, Mr. Williams was part of a trio trying to obtain a legal 502-license. He had partnered with two men: Rick Sohns and Michael Garton, Jr, the owner of Mind's Eye Glass and Vape, in Spokane Valley. The defense interviewed Mr. Garton at length, and he explained that he met Mr. Williams in late 2016 or early 2017, when he and Sohns were looking to invest. Garton and Sohns visited the Sherman Road property numerous times in winter 2017, entered negotiations about purchasing the 10-acre property from the owner, and created a business plan to obtain a license. (At the time, as Mr. Garton explained, licenses had to be purchased from other holders; the state did not issue them. Instead, the state approved the transfers and the grow properties.) Mr. Garton said he spoke with Mr. Williams about five times per week for months. They planned infrastructure investments and obtained financing to purchase the license.

A problem arose. Washington had set a minimum-size for a 502-grow operation: 10 acres. And Mr. Williams, Garton, and Sohns discovered their 10-acre property

*wasn't* actually 10-acres—it was 9.55 acres, as confirmed by Spokane County's official records:



The property was undersized. But according to Garton, the group began investigating whether they could save the business plan by purchasing a .5 acre strip of land from a neighboring property, putting them over the 10-acre threshold. But soon after, Mr. Williams was arrested at the Sherman Road property, where he was growing saplings and drying marijuana.

1    None of this is to say that Mr. Williams is innocent. The government rightly

2 emphasizes Mr. Williams's illegal conduct: ***First***, he started growing before being

3 licensed, and the grow therefore failed to comply with existing state regulations.

4 ***Second***, to fund his business, Mr. Williams had diverted and transported marijuana to

5 states where it was illegal.

6    At the same time, Probation has missed at least one mitigating point. In the PSR,

7 Probation notes as an aggravating factor that Mr. Williams "did not possess a

8 Washington State license authorizing him to manufacture or sell marijuana."[19] But Mr.

9 Williams ***did*** have a medical marijuana card authorizing him to do precisely that—it

10 expired in 2017 before his arrest, but applied during 2016, while he was growing at the

11 Spokane Valley residence, as noted in his post-arrest interview with officers.[20] It would

12 be more accurate to say that Mr. Williams's medical authorization had expired and he

13 had yet to obtain the I-502 license—he was arrested during a gap between the two

14 licenses.

---

[19] PSR ¶ 137.

[20] Bates 38 ("Williams admitted that he does not have a license to grow marijuana . . . his medical marijuana was expired.")

**2.      Mr. Williams's firearms should not give the Court pause about probation.**

When arrested, officers found two handguns, a Sig Sauer and a Glock.[21] Probation highlights one of the more remarkable things about this case: Mr. Williams "had been authorized by local Courts and municipalities to possess firearms."[22] That sentence is at the end of the PSR and might get lost, but it is crucial. Mr. Williams was originally charged with a 924(c)-count and being a felon in possession of a firearm, perhaps suggesting he was flagrantly violating firearms laws.

He was not. Mr. Williams had past felonies, so he hired a lawyer, Bill Baker, to restore his gun rights, paying $1700 for his services. Mr. Baker told Mr. Williams that his rights had been restored and provided a Spokane County Superior Court order specifically saying his "right to possess firearms is *restored*":

---

[21] PSR ¶ 23.

[22] PSR ¶ 138.

**Gun Rights Restoration Certificate**

FILED

APR 2 6 2016

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK
(Clerk's Date Stamp)

(Copy Receipt)

SUPERIOR COURT OF
WASHINGTON
COUNTY OF SPOKANE

Petitioner: NATHANIEL E. WILLIAMS    CASE NO. 15203722-1

vs.    RCW 9.41.040/9.41.047 CERTIFICATE
RE: CRIME UUCSA, TRAFFICKING STOLEN
Respondent: STATE OF WASHINGTON    PROPERTY
DATE OF SENTENCE: 4-26-14, 2-10-11

THIS MATTER having come on for hearing before the above entitled court on the _____ day
of _____, it is hereby declared the petitioner in the above-entitled action is granted a
Certificate and the petitioner's right to possess firearms is restored pursuant to RCW 9.41.040(4).

This declaration is based on the petitioner's successful completion of ☐ probation, ☐ deferred
prosecution, ☐ deferred sentence, ☐ community supervision or ☐ _____
in the above-entitled matter and the lack of any criminal convictions since a finding of guilt entered in the
above-entitled matter.

DONE IN OPEN COURT this 26 day of April, 20 16.

JUDGE

Presented by:
William L. Baker
Attorney for Petitioner, WSBA # 12582

Williams Nathaniel
Petitioner

Approved for entry:
Attorney for Respondent, WBA # 17859

RCW 9.41.040/9.41.047 CERTIFICATE    PAGE 1 OF 1
Rev: 8/2007

Wishing to stay well within the firearms laws, Mr. Williams then applied for a

concealed-carry permit, which the State of Washington issued:



1    Mr. Baker failed to tell Mr. Williams that he had not done anything about a single,

2    nearly decade-old Florida conviction for transferring stolen property.[23] And more

3    worrisome, Washington State conducted a criminal-history check before telling Mr.

4    Williams he was authorized to possess a gun again.[24]

5        After he believed his gun rights restored, Mr. Williams and his then-girlfriend

6    Kedaga White went to a local shooting range, Sharp Shooters, and filled out the regular

7    federal firearms forms, according to what White told federal investigators.[25] White

8    bought the guns, and told officers the Sig Sauer belonged to her, but "it is too big for

9    her and she wanted to buy a smaller gun."[26]

10        Mr. Williams explains his interest in a gun was two-fold. He grew up with two

11    military parents and spent time in rural Florida—he shoots as a hobby. And he wanted

12    a handgun because there were coyotes constantly causing trouble at the Sherman Road

13    property.

14        Mr. Williams went to remarkable lengths to get his gun-rights restored—he was

15    not some carefree felon flaunting gun laws with impunity.

---

[23] *See* PSR ¶ 54.

[24] *See* Wash. Dept. of Licensing, *How to get your license: Concealed pistol license (CPL)* (Feb. 23, 2021) (available at: https://bit.ly/2ZKbSvo) (noting state will "complete the fingerprints and background check" before issuing license).

[25] Bates 311.

[26] Bates 311.

**C.    Probation constitutes a just sentence and promotes respect for the law.**

Mr. Williams is guilty of distributing not methamphetamine, cocaine, heroin, pills, or any other universally-illegal drug; he is convicted of growing and distributing marijuana, which has been either legalized or decriminalized in all but six states:[27]



As a starting point, the Court will be sentencing Mr. Williams for distributing a substance that can be bought legally with a credit card **.3** miles from the Spokane federal court:[28]

---

[27] *See* DISA Global Solutions, *Map of Marijuana Legality by State* (Feb. 2021) (available at: https://bit.ly/3syX7In). DISA advised companies on employment matters, providing drug-and-alcohol testing, background check services, DOT compliance, and other matters.

[28] Google Maps (available at: https://bit.ly/3aRNsGR).

In a 2017 Gallup poll, two-thirds of the American public believed marijuana should be legalized.[29] Fundamentally, the public and state legislatures widely regard marijuana as sufficiently safe that adults can consume it lawfully. While the public's view of marijuana does not change federal law, the Sentencing Reform Act compels courts to consider the amorphous question: "what is just punishment"? And just punishment must, to some degree, reflect what the community views is right and wrong. Both public surveys and the continued expansion of marijuana legalization suggests Mr. Williams's offense cannot be considered on par with the typical drug-trafficking offense.

---

[29] Justin McCarthy, *Record-High Support for Legalizing Marijuana Use in U.S.*, Gallup News (Oct. 25, 2017) (available at: https://bit.ly/3bzsuvb).

Beyond marijuana legalization, one federal judge, Hon. James S. Gwin, actually tested whether the public views federal sentences generally as just punishment. He and his colleagues in the Northern District of Ohio polled jurors in 22 criminal cases, and before sentencing, described the defendant's past criminal convictions, and asked for a recommended punishment—what each juror thought was fair. *See* Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harv. L. & Pol'y Rev. 173, 195 (2010). The median juror-recommended sentence was just **19%** of the median guideline range. *Id.* at 175. In Judge Gwin's words, the results "strongly suggest[] that the Guidelines are untethered to appropriate punishments as determined by jurors actually hearing the case." *Id.* Federal sentences have become detached from society's idea of "just punishment," which is how a non-violent drug-offender like Mr. Williams wound up facing a three- to four-year guideline range in the first place.

### D.    Mr. Williams's extraordinary rehabilitation and pretrial compliance warrant probation.

The Sentencing Reform Act directs courts to consider the need for rehabilitation when imposing sentence, and Mr. Williams has demonstrated prison is unnecessary to spur reform. *See* 18 U.S.C. § 3553(a)(2)(D) (court must consider need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment").

It has been three years since Mr. Williams was released on pretrial conditions.[30] And for three years, Mr. Williams has been perfect.[31] He has worked diligently. Provided for his family. He has never moved without telling Probation. He has never failed to show for an appointment. Not a single driving infraction. If Mr. Williams were on post-trial supervision, the defense would move to terminate his supervision early.

### E.    A prison sentence would serve no deterrent purpose.

A prison sentence is unnecessary to deter Mr. Williams. He has been a model supervisee and proven he can and will follow the Court's rules. As for using a prison sentence to deter others, that is a sadly-persistent myth. That conclusion is bolstered by research from the National Institute of Justice, an arm of DOJ itself, which says "[s]ending an individual convicted of crime to prison isn't a very effective way to deter crime."[32] What deters crime is the "*certainty* of being caught," not the harshness of punishment: "Research shows *clearly* that the chance of being caught is a vastly more effective deterrent than even draconian punishment."[33]

---

[30] ECF No. 29 (granting release on April 13, 2018).

[31] Mr. Williams's sole petition was filed 2.5 years ago. ECF No. 37. It alleges he tested positive for marijuana on April 18, 2018. That was a residual-positive test just a week after his release from custody. The remaining violations were simply for returning home from work or leaving for work before curfew. The defense addressed these at ECF No. 39, and modified the condition so that Mr. Williams could reside closer to his worksite during the week, thus avoiding the location-monitoring violations. *See* ECF No. 40 at 2 (granting modification).

[32] Nat'l Instit. of Just., *Five Things About Deterrence* (June 5, 2016) (available at: https://bit.ly/2XA9g2s).

[33] *Id.* (emphasis added). "*The certainty* of being caught is a vastly more powerful deterrent than the

Adding to DOJ's conclusion is recent proof from the Sentencing Commission, which last year released a compelling study proving that longer sentences deter nothing. The Commission's study came in the wake of the drugs-minus-two changes to the guidelines,[34] an amendment that created a once-in-a-lifetime research opportunity, comparing two groups: (1) offenders released early under the drugs-minus-two amendment; and (2) offenders who just barely missed out on the amendment.[35] If more prison meant less recidivism, then the second group (who served more time) should commit fewer crimes after release. But "[t]here was *no* statistically significant difference" between the groups—in fact, the early-release group actually had a slightly lower recidivism rate.[36]  More prison does not generally deter crime.

**F.    A guideline sentence would create disparity.**

Apart from all the many reasons to avoid prison in this case, Courts impose below-guideline sentences in marijuana cases more often than not.[37]

---

punishment."

[34] *See* U.S.S.C., *Guidelines Manual*, App. C., amendment 782 (effective Nov. 1, 2014).

[35] U.S. Sentencing Commission, *Retroactivity & Recidivism: The Drugs Minus Two Amendment* (July 2020) (available at: https://bit.ly/3e62vN0).

[36] *Id.* at 6 (noting that the Retroactivity Group recidivated at 27.9%, while the Comparison Group that served the higher sentences recidivated at 30.5%). Other research has suggested the same—more prison can cause higher recidivism. *See* Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project 7 (2010) (presenting findings from a study of a nationally representative sample of prisoners demonstrating "an increased likelihood that lower-risk offenders will be more negatively affected by incarceration," and that "reduced sentences may reduce recidivism rates").

[37] *See* U.S.S.C., *Sourcebook 2019, Table D-14* (2019) (available at: https://bit.ly/3qQkGfd) (noting that 52% of marijuana sentences were outside the guideline range; just 48% within range; and only

Sentencing Memorandum
– 20 –

# IV.   Conclusion

For the reasons above, a sentence of probation and 10-years supervision suffices.

Dated: February 23, 2021.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Nate Williams

s/Colin G. Prince
Colin G. Prince, WSBA No. 43166
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Colin_Prince@fd.org

## Service Certificate

I certify that on February 23, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will notify Assistant United

States Attorneys: Dave Herzog.

s/Colin G. Prince
Colin G. Prince, WSBA No. 43166
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Colin_Prince@fd.org

---

.5% were above range). Judges depart from the guidelines when marijuana is involved at substantially higher rates than all other drugs. *Id.* (showing marijuana has the highest non-guideline compliance of any drug).